UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SHERRI L. MAXFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CASE NO. 1:06-cv-1334-DFH-TAB |
| MICHAEL J. ASTRUE,[1] | ) | |
| Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON JUDICIAL REVIEW

Plaintiff Sherri L. Maxfield seeks judicial review of a decision by the Commissioner of the Social Security Administration denying her applications for disability insurance benefits. Administrative Law Judge Albert J. Velasquez had previously denied Ms. Maxfield's application for disability insurance in 2001, finding her capable of performing sedentary work with some restrictions. In 2003, the court accepted the parties' joint motion to remand the case to ALJ Velasquez to reevaluate specific limitations and hear expert testimony. In 2005, on behalf of the Commissioner, the ALJ determined that although Ms. Maxfield suffered severe physical and mental impairments, she still retained the residual functional

---

[1]Michael J. Astrue took office as Commissioner of the Social Security Administration while Ms. Maxfield's case was pending before the court. Commissioner Astrue is substituted as the defendant in this action pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

capacity to perform sedentary work subject to numerous physical and mental restrictions.  On appeal, Ms. Maxfield argues that the ALJ did not comply with the parties' negotiated directives set forth in the 2003 remand and that the ALJ's decision to deny benefits was not supported by substantial evidence.  The court finds that the ALJ appropriately considered the remand's directives and supported his denial with substantial evidence.  The denial is affirmed.

*Background*

Ms. Maxfield was born in 1957 and worked for over twenty years as an emergency phone call dispatcher and supervisor for a victims assistance unit with the Indianapolis Police Department.  Beginning in late 1997, Ms. Maxfield began having difficulties performing her duties at work due to health problems.  R. 370-71.  She had recently stopped smoking after twenty years, gained a substantial amount of weight, experienced carpal tunnel pain, and undergone knee surgery.  R. 209, 439, 447, 451, 895.  The police department allowed Ms. Maxfield to miss a number of days and also adjusted her work duties to eliminate field work.  Ms. Maxfield went on medical leave in December 1998 but returned in late January 1999.  R. 876-77.  After returning, she worked sporadically before permanently leaving the police department in May 1999.  R. 877.

At some point in 1998, Dr. Shashi Shekhar noted that Ms. Maxfield had fibromyalgia.  R. 485, 527.  Dr. Bruce Bender noted in April 2000 that the pain

medication Neurontin seemed to alleviate Ms. Maxfield's fibromyalgia symptoms. R. 630.  In April 2002, Dr. Larry Greenbaum recommended that she see a pain specialist, but she said that she was not interested in doing so at that time.  R. 306.  In the spring of 2004, Dr. Greenbaum recommended that Ms. Maxfield consider cognitive behavioral therapy to deal with her pain.  She looked into it but told Dr. Greenbaum that her insurance would not cover the therapy.  R. 157.  In August 2004, Dr. Greenbaum recommended that Ms. Maxfield see a psychiatrist who specialized in chronic pain, but she was not interested because she said that getting to the psychiatrist's office would be too far for her to travel.  R. 705.

In October 1998, Dr. Shekhar referred Ms. Maxfield to Dr. Robert Pascuzzi, a neurologist, who found that Ms. Maxfield had difficulties holding or gripping things due to carpal tunnel syndrome.  R. 442.  On January 6, 1999, Dr. Alexander Mih performed a carpal tunnel release on Ms. Maxfield's right wrist. R. 454.  During a follow-up visit on January 15, 1999, Dr. Mih noted that Ms. Maxfield had some tingling in her right thumb but overall was doing quite well and was "happy with her result."  R. 457.

In December 1998, Dr. David Heck diagnosed Ms. Maxfield with mild osteoarthritis in both knees.  R. 452.  On December 23, 1998, Dr. Heck performed arthroscopy on Ms. Maxfield's right knee.  R. 445.  Dr. Keith Miller performed arthroscopy on Ms. Maxfield's left knee on January 28, 2000.  R. 241.  After the second arthroscopy, Ms. Maxfield went to physical therapy to strengthen her knee.

She stopped going to physical therapy in February 2000 because she felt that she was "unable to participate in physical therapy" due to her fibromyalgia.  R. 599. Dr. Miller performed another arthroscopy on Ms. Maxfield's right knee on May 18, 2001.  R. 217.  He recommended that Ms. Maxfield attend physical therapy after this third surgery, but she preferred "to do it on her own at home . . . ."  R. 341. On June 29, 2001, Dr. Miller reported that Ms. Maxfield seemed to be healing well, had "good comfortable motion," and seemed to have good strength.  *Id.*  In 2003, Dr. Greenbaum also gave Ms. Maxfield a series of Hyalgan injections – a natural solution that acted as a lubricant and shock absorber – in her right knee.

Throughout the record, Ms. Maxfield reported to her doctors that she was extremely tired all of the time.  R. 309, 497, 554, 710, 712, 728, 747, 763, 798, 803, 806.  Dr. Greenbaum recommended that Ms. Maxfield undergo a sleep study with the St. Francis Hospital Sleep Disorder Center.  After reviewing the sleep study results, Dr. Manfred Mueller reported that Ms. Maxfield had no "significant snoring or respiratory disturbances" but that she might be experiencing chronic sleep deprivation.  R. 229.  In February 2004, Dr. Greenbaum adjusted Ms. Maxfield's medications to see if they were contributing to her fatigue.  R. 148.  At her second hearing in December 2004, Ms. Maxfield reported that her fatigue was "just unbelievable at this point."  R. 847.

Additionally, Ms. Maxfield's weight fluctuated throughout the record.  In December 1997, she weighed 276 pounds.  R. 497.  In December 1998, she

weighed 287 pounds.  R. 450.  In August 1999, she weighed 308 pounds.  R. 562.
In September 2000, she weighed 296 pounds.  R. 803.  In July 2001, she weighed
286 pounds.  R. 333.  In April 2002, she weighed 267 pounds.  R. 307.  In August
2002, she weighed 255 pounds.  R. 747.  In August 2003, she weighed 276
pounds.  R. 715.  In August 2004, she weighed 258 pounds.  R. 705.  Her doctors
repeatedly discussed with her that weight loss was very important for improving
her health.  R. 345-46, 705, 803.  She met success with dieting, but she reported
having difficulty exercising regularly because it exacerbated her fibromyalgia and
was too expensive.  R. 167, 298, 330.

Over the course of several years, a number of doctors also discussed how
Ms. Maxfield's physical and mental impairments affected her ability to work.  In
August 1999, Dr. Bender stated that he believed Ms. Maxfield was "unable to work
now due to the constellation of her problems including severe obesity,
fibromyalgia, and degenerative arthritis of the knees complicated by some
depression."  R. 562.  In November 1999, Dr. Greenbaum stated that he believed
that Ms. Maxfield was "completely disabled by her fibromyalgia."  R. 555.  In
January 2000, Dr. Greenbaum again stated that he believed that Ms. Maxfield
was "permanently disabled from any occupations."  R. 549.

In June 2001, Dr. Greenbaum completed a "Fibromyalgia Residual
Functional Questionnaire."  R. 789-94.  He reported that due to her continuous,
severe pain, Ms. Maxfield could not continuously sit, stand, or walk for two hours.

She could not work an eight-hour day and could never lift anything weighing ten pounds. She would also be absent from work more than three times a month. In July 2004, Dr. Greenbaum described Ms. Maxfield as a "straight forward individual who does not exaggerate her symptoms." R. 706. In March 2005, Dr. Greenbaum again assessed Ms. Maxfield's residual functional capacity. R. 765-68. He found that she was capable of handling low stress jobs. She could not, however, walk any length without experiencing severe pain or having to rest. She could not stand or walk for two hours. She could sit for only two hours. She would need frequent rest breaks and would need to lie down for several hours or days before returning to work. R. 767. He found that she could never lift anything weighing ten pounds or stoop, crouch, or climb. She would also miss more than four days per month.

In April 2000, Dr. Dobson reviewed Ms. Maxfield's medical file and completed a physical residual functional capacity form. R. 618-25. Contrary to Dr. Greenbaum's findings, Dr. Dobson determined that Ms. Maxfield could occasionally carry twenty-pound objects; frequently carry ten-pound objects; stand, walk, and sit six hours per workday; and push and pull objects for unlimited amounts of time. Dr. Dobson also found that she was limited in her ability to reach with her left arm. Dr. Dobson reported that Ms. Maxfield's descriptions of her impairments were "partially credible" but that these impairments did not completely prevent her from working. R. 623. In June 2004, Dr. Whitley also reviewed Ms. Maxfield's medical file, completed a physical

residual functional capacity form, and made the same assessment as Dr. Dobson regarding Ms. Maxfield's residual functional capacity.  R. 199-206.

Although Ms. Maxfield did not base her disability claim on any mental impairments, her medical history revealed patterns of depression.  She reported having suicidal thoughts at times. R. 172. Every doctor who examined her found, however, that her mental impairments were not disabling.  Dr. April Faidley examined Ms. Maxfield in March 2000 and found that she had some mild symptoms of depression. R. 608. Dr. Howard Wooden examined Ms. Maxfield in February 2004 and found that she had moderate symptoms of depression.  Dr. Gange completed a "Psychiatric Review Technique" form in February 2004 and found that Ms. Maxfield's depression was not a severe impairment.  R. 179, 191.

Ms. Maxfield's health problems seemed to stem primarily from her fibromyalgia, insomnolence, obesity, and joint pain.  She reported significant problems sleeping through the night, sometimes waking up after rolling over wrinkles in the bed clothes.  R. 747.  She experienced chronic pain all over her body, which she tried to control through pain medication.  R. 559, 604, 630. Because of these difficulties, she often stayed in bed for most of the day.  R. 110, 604.  She read and did laundry on a regular basis.  R. 394, 399.  Occasionally, she went to the grocery store with her husband.  R. 399, 403.  Her husband, children, and in-laws managed the rest of the household's chores.  R. 111, 399.

She had difficulty walking distances as short as from a parking lot to the doctor's office for an appointment.  R. 172, 210.

She first filed for disability benefits on December 30, 1999.  After a hearing, the ALJ denied her claim on August 23, 2001.   He found that while her fibromyalgia, obesity, osteoarthritis, and chronic sleep deprivation constituted severe impairments, she still retained the residual functional capacity to perform simple and repetitive sedentary work.  R. 659.   Based on the parties' negotiated recommendations and joint motion for remand, on March 17, 2003, the district court remanded the case with six instructions:   (1) reevaluate Ms. Maxfield's impairments and her residual functional capacity, particularly in light of issues with her left arm; (2) reevaluate Ms. Maxfield's mental impairments; (3) reevaluate Ms. Maxfield's credibility; (4) reevaluate Ms. Maxfield's obesity; (5) obtain testimony from a medical expert familiar with fibromyalgia to assist in determining Ms. Maxfield's residual functional capacity; and (6) obtain additional evidence from a vocational expert.  R. 668-70.   In September 2003, Ms. Maxfield filed another disability application.  R. 96-97.  After another hearing, the ALJ denied Ms. Maxfield's consolidated claims for disability on October 21, 2005.  He found that her fibromyalgia, osteoarthritis, left shoulder impingement syndrome, left tennis elbow, obesity, and depression constituted severe impairments.   Ms. Maxfield, however, still retained the residual functional capacity to perform simple and repetitive sedentary work subject to numerous physical and mental restrictions.  R. 46.

*Statutory Framework for Determining Disability*

To be eligible for disability insurance benefits, Ms. Maxfield must establish that she suffers from a disability as defined by the Social Security Act ("the Act") in 42 U.S.C. § 423(d).  Under section 423(d), a disability is an inability to engage in any substantial, gainful activity by reason of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of no less than twelve months. The disability must arise while the claimant is insured for benefits.  See 42 U.S.C. §§ 423(a), (c)(1); *Briscoe v. Barnhart*, 425 F.3d 345, 348 (7th Cir. 2005); 20 C.F.R. § 404.131.

This standard is a stringent one.  The Act does not contemplate degrees of disability or allow for an award based on partial disability.  *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985).  The Act provides important assistance for some of the most disadvantaged members of American society.  But before tax dollars are available for disability benefits, it must be clear that the claimant has an impairment severe enough to prevent her from performing virtually any kind of work.  Under the statutory standard, these benefits are available as a matter of nearly last resort.

The implementing regulations for the Act provide the familiar five-step sequential evaluation of a disability claim.  See 20 C.F.R. § 404.1520(a)(4).  The steps are:

(1)   Is the claimant currently employed?  If so, she is not disabled.

(2)   If not, does the claimant have a severe impairment or combination of impairments?  If not, she is not disabled.

(3)   If so, does the impairment meet or equal an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. § 404?  If so, the claimant is disabled.

(4)   If not, does the claimant retain the residual functional capacity to perform her past relevant work?  If so, she is not disabled.

(5)   If not, according to the claimant's residual functional capacity, age, education, and work experience, can the claimant make an adjustment to other work?  If so, she is not disabled.  If not, she is disabled.

When applying this test, the burden of proof rests on the claimant for the first four steps and on the Commissioner for the fifth step.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

*Standard of Review*

If the Commissioner's decision is supported by substantial evidence, it must be upheld by a reviewing court.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by re-weighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses.  *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000).  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict.  *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or if the ALJ based the decision on serious factual mistakes or omissions, *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).  The ALJ has a basic obligation to develop a full and fair record, *Nelson*, 131 F.3d at 1235, and must build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings, *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003).  If the evidence on which the ALJ relied does not support the conclusion, the decision cannot be upheld.  *Id.*

*The ALJ's Disability Determination*

At the first step in the five-step process, the ALJ found that Ms. Maxfield had not been employed between the time she applied for disability and December 31, 2004, when her insured status expired. At the second step, the ALJ determined that Ms. Maxfield's fibromyalgia, osteoarthritis, left shoulder impingement syndrome, left tennis elbow, obesity, and depression were severe impairments. At the third step, the ALJ found that these impairments, individually or combined, did not meet or equal a listed impairment. At the fourth step, the ALJ determined that Ms. Maxfield could not perform any of her past relevant work. At the fifth step, the ALJ determined that Ms. Maxfield could perform a limited range of sedentary work.

The ALJ added a number of restrictions, including only occasional lifting or carrying objects up to ten pounds; sitting for only six hours; standing or walking for only two hours; only occasional bending, squatting, or climbing stairs or ramps; no kneeling, crawling, or climbing ropes, ladders, or scaffolds; no walking on uneven surfaces or working in dangerous conditions; no overhead lifting; and no more than superficially interacting with others. Using vocational expert testimony, the ALJ determined that Ms. Maxfield could work as a cashier, information clerk, or inspector.

The ALJ concluded that Ms. Maxfield was not disabled for purposes of the Social Security Act before December 31, 2004.  The Appeals Council denied Ms. Maxfield's request for review, leaving the ALJ's decision as the final decision of the Commissioner of Social Security.  See *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000).  Ms. Maxfield asks this court to review the denial of her application for disability insurance.  The court has jurisdiction under 42 U.S.C. § 405(g).

*Discussion*

I.    *Credibility*

Ms. Maxfield argues that the ALJ failed to meet the third directive on remand:  to reevaluate her credibility.  In his first opinion, the ALJ discussed Ms. Maxfield's reports of intractable pain.  R. 655-57.  He found that x-rays, range-of-motion tests, post-surgery examinations, and Ms. Maxfield's descriptions of her daily activities contradicted her subjective reports of pain so severe as to be disabling.  *Id.*  On remand, the ALJ partially discredited Ms. Maxfield's reports of pain because she rejected Dr. Greenbaum's repeated suggestions for further treatment and because the medical examination reports did not substantiate disabling conditions.  R. 37-38.

Because the ALJ is in the best position to observe a witness's demeanor, courts will not ordinarily set aside an ALJ's credibility determination if it is supported by the record and not patently wrong.  See *Herron v. Shalala*, 19 F.3d

329, 335 (7th Cir. 1994).  An ALJ is required to compare the objective medical evidence of a claimant's impairment with the claimant's description of her pain's intensity and persistence in light of a number of factors, including any treatment taken to relieve pain other than medication.  See 20 C.F.R. § 404.1529(c)(3).

As the Seventh Circuit observed in *Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996) (reversing denial because the ALJ made a number of statements demonstrating in part a "pervasive misunderstanding of the disease"), fibromyalgia is "a common, but elusive and mysterious, disease" with unknown causes and with symptoms that are "entirely subjective."   Some people afflicted with fibromyalgia are disabled from working, but most are not.  *Id.* at 307.  As the *Sarchet* court explained, the severity of fibromyalgia is difficult to substantiate because of the "unavailability of objective clinical tests."  *Id.*

Because of the unavailability of objective clinical tests, the claimant's credibility and subjective assertions of pain are crucial to the ALJ's disability determination.   The ALJ considered Ms. Maxfield's testimony that she had constant pain "all over."  R. 37.  He noted that Dr. Greenbaum had recommended but Ms. Maxfield had refused to see a pain specialist, to undergo cognitive behavioral therapy, or to see a psychiatrist who specialized in chronic pain.  R. 38. The ALJ found these refusals to seek further treatment inconsistent with Ms. Maxfield's "allegations concerning the frequency and severity of her pain."  *Id.*  The ALJ also noted that while Ms. Maxfield repeatedly rejected other forms of pain

treatment, she "frequently requested more narcotics and stronger narcotics for pain . . . ." *Id.* He concluded that Ms. Maxfield's descriptions of her pain were not reasonably consistent with the objective medical evidence. Thus, he found that Ms. Maxfield's fibromyalgia was a severe impairment but was not disabling.

The relevance of a claimant's failure to seek medical treatment is sometimes questionable, particularly when she is unable to afford the treatment. See *Herron*, 19 F.3d at 336 (questioning ALJ's decision to discredit claimant because claimant did not submit any new medical records at second hearing); *Caviness v. Apfel*, 4 F. Supp. 2d 813, 820-21 (S.D. Ind. 1998) (remanding where ALJ discredited claimant for failing to seek additional treatment). In *Caviness*, the ALJ found that the claimant, who alleged disability due to chronic bronchiectasis and sinusitis, could perform light work. The claimant asserted that she was disabled only when these conditions "flared-up," but her frequent absences due to these exacerbations prevented her from keeping a full-time job. The ALJ discredited the claimant's testimony based on her failures to seek medical attention regularly and to use an inhaler. The claimant testified that she wanted to see her doctor more frequently but could afford to go only once a year to renew her prescriptions. She also stated that she stopped using her inhaler because it was not helpful. Based on the ALJ's mis-characterization of this evidence, this court remanded because the ALJ had improperly discredited the claimant's testimony about the severity of her impairments.

Here, the ALJ found that Ms. Maxfield's pain from fibromyalgia was significant and constituted a severe impairment.  Partly because of this pain, he restricted her residual functional capacity to sedentary work.  R. 43.  Unlike the claimant in *Caviness*, however, Ms. Maxfield was able to frequently visit her doctors and never tried any of the non-medicinal pain treatments that Dr. Greenbaum recommended.  See 20 C.F.R. § 404.1529(c)(3) (informing claimants that the ALJ will consider "what medications, treatments or other methods" claimants use to alleviate symptoms in evaluating the symptoms' intensity and persistence).  The ALJ found that Ms. Maxfield's refusals to seek any non-medicinal relief for her pain weighed against the believability of her subjective complaints.  His finding was not based on serious factual errors, was supported by the record, and does not warrant reversal.

II.    *Expert Testimony on Fibromyalgia*

Ms. Maxfield next argues that the ALJ failed to meet the fifth directive on remand:  to obtain testimony from a medical expert familiar with fibromyalgia to assist in determining her residual functional capacity.  She asserts that the ALJ improperly disregarded the residual functional capacity determinations by her treating rheumatologist, Dr. Greenbaum.   Because the ALJ rejected Dr. Greenbaum's assessments and did not obtain testimony from another rheumatologist, Ms. Maxfield argues that the ALJ improperly made his own findings about the subjective nature of fibromyalgia.

-16-

While Ms. Maxfield argues that the ALJ ignored the remand directive by not summoning a rheumatologist, she fails to mention that she and her counsel negotiated the terms of the remand and never objected to the ALJ calling Dr. Boyce at the December 2004 hearing.  At Ms. Maxfield's first hearing in July 2001, no medical expert testified or was even present to testify.  R. 872.  At her second hearing in December 2004, the ALJ summoned Dr. Paul Boyce.  R. 844.  The ALJ initially thought that Dr. Boyce was a rheumatologist:

> ALJ:   . . . we also have with us Dr. Paul Boyce.  He's a board certified rheumatologist.
>
> ME:   No.
>
> ALJ:   Internal medicine?
>
> ME:   Internal medicine.
>
> ALJ:   Internal medicine and [INAUDIBLE] I thought that they were all [INAUDIBLE].
>
> ME:   Well there's, there's subspecialties, Your Honor –
>
> ALJ:   [INAUDIBLE].
>
> ME:   – and I'm, my subspecialty falls more into endocrinology.

*Id.*  Clearly, the ALJ did not summon a rheumatologist or another fibromyalgia specialist.  He did, however, summon an internist who was  knowledgeable about a wide range of adult diseases, including fibromyalgia.

Dr. Boyce testified that doctors performed fibromyalgia tests for tender points two different times.  In November 1999, Dr. Greenbaum reported that Ms.

Maxfield was tender in eleven out of the eighteen tender points, many of which were "extremely painful" in his opinion.  R. 554.  In April 2000, Dr. William Buffie reported that Ms. Maxfield was tender in all eighteen of the points.  R. 632.  Dr. Boyce concluded that Ms. Maxfield's medical record indicated that she had "symptoms of kind of chronic pain and fatigue."  R. 859-60.

Ms. Maxfield did not object to this assessment of her fibromyalgia at the hearing.  Instead, Ms. Maxfield now asserts that Dr. Boyce's testimony is "wholly supportive of her claim."  Pl. Br. 12.  A claimant is not entitled to choose the expert who testifies as her hearing.  The regulations do not even permit an ALJ to choose a particular medical expert.  See *Keith v. Barnhart*, 473 F.3d 782, 788 (7th Cir. 2007) (observing that Social Security Administration procedures require that "medical experts of like specialties be selected on a rotating basis from a roster maintained by each of the Administration's Regional Offices").  The ALJ summoned Dr. Boyce, an internist, who was familiar with fibromyalgia and never displayed any sign of hesitation or incompetence in assessing Ms. Maxfield's history of fibromyalgia.

In light of Ms. Maxfield's arguments to this court, it is important to note that Ms. Maxfield did not object to Dr. Boyce's testimony at the December 2004 hearing.  Nor did her attorney ask Dr. Boyce any questions.  The presence of an

internist rather than a rheumatologist was not *per se* unreasonable and did not violate the terms of the remand order.[2]

Ms. Maxfield also argues that the ALJ improperly disregarded Dr. Greenbaum's assessments and "played doctor" in evaluating her fibromyalgia. The ALJ discounted Dr. Greenbaum's general statements that Ms. Maxfield was disabled because the regulations reserve that determination for the Commissioner. 20 C.F.R. § 404.1527(e)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."). He discounted Dr. Greenbaum's residual functional capacity assessments because he believed that Dr. Greenbaum "completed the form based on his knowledge of the claimant and on the claimant's answers regarding the questions on the form (Ex. AC1 at 16)." R. 44. The court could not find an exhibit marked "AC1 at 16" in the record but found two references to Dr. Greenbaum

---

[2]The court assumes that the parties carefully drafted the six instructions in the remand order because they believed they were important. The following exchange, occurring less than a minute after the quoted exchange on Dr. Boyce's specialty, is therefore troubling:

ALJ   Were there two cases [INAUDIBLE] as we go forward.  And this is a court remand.  Do we have a definitive idea in what it was the court wanted us to do?
ATTY Well, Judge, the only I'm seeing is that they just wanted to have a new hearing.
ALJ   [INAUDIBLE] the records?
ATTY I didn't, I didn't do the, I didn't do the appeal.

R. 845.  In other words, Ms. Maxfield is now arguing that the ALJ failed to comply with the terms of remand when her attorney was not familiar with the terms of the remand when the ALJ asked him, and he failed to object to Dr. Boyce's qualifications.

completing disability forms for Ms. Maxfield, including a December 2001 request
for Dr. Greenbaum to write a letter stating that she was disabled.  R. 327, 560.
Neither reference included any indication that Dr. Greenbaum completed Ms.
Maxfield's June 2001 and March 2005 residual functional capacity forms by
simply filling in her answers to the forms' questions.  Dr. Greenbaum's residual
functional capacity assessments, however, essentially tracked Ms. Maxfield's own
descriptions of her limitations.

The ALJ also discredited Dr. Bender's statement about Ms. Maxfield's
inability to work because Dr. Bender made that observation during his first
meeting with Ms. Maxfield and based his comment on a combination of different
conditions, including depression.  Those reasons would not necessarily justify
discounting Dr. Bender's statement, but again, 20 C.F.R. § 404.1527(e)(1) provides
that a doctor's disability determination is not binding on an ALJ.

Although he did not specifically mention Dr. Dobson or Dr. Whitley, the ALJ
also discounted the "non-examining State Agency physicians" who opined that Ms.
Maxfield was capable of doing light work.  R. 45.  The ALJ noted that Dr. Iyes
Sheikhoucef, who examined Ms. Maxfield as a consulting physician for the state,
reported that Ms. Maxfield could not walk more than a few blocks.  R. 45, 210.
Based on this inconsistency, the ALJ found that the non-examining physicians'
assessments (*i.e.*, Dr. Dobson's and Dr. Whitley's) were not supported by
substantial evidence.

Because he rejected the consulting physicians' assessments of Ms. Maxfield's fibromyalgia, the ALJ relied on the portions of her treating physicians' assessments and her subjective complaints that he found credible. The ALJ did not have to believe Ms. Maxfield's subjective complaints, see *Sarchet*, 78 F.3d at 307, and he did not have to believe Dr. Greenbaum's reports about an entirely subjective condition that mirrored his patient's subjective complaints, see *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) ("medical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints"); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) ("a claimant is not entitled to disability benefits simply because her physician states that she is 'disabled' or unable to work"). See generally *Farrell v. Sullivan*, 878 F.2d 985, 989 (7th Cir. 1989) ("The ALJ can weigh evidence and make judgments as to what evidence is most persuasive.").

In *Dixon*, the claimant argued that the ALJ had "played doctor" in rejecting a treating physician's opinion that the claimant had severe physical restrictions. The treating physician had accepted the claimant's complaints at face value and given the claimant "the benefit of the doubt whenever possible." 270 F.3d at 1177. The ALJ rejected the physician's opinions because the physician did not elaborate on her basis for finding significant restrictions. The *Dixon* court found that the cases the Seventh Circuit had reversed because the ALJ "played doctor" were ones in which the ALJ did not address relevant evidence. Because the ALJ

discussed the relevant evidence and was not "patently wrong," the *Dixon* court upheld the ALJ's denial of benefits.

Here, the ALJ discussed the relevant evidence and was not "patently wrong" in concluding that while Ms. Maxfield's fibromyalgia was severe, it was not disabling. The court finds no reversible error in calling an internist rather than a rheumatologist or in the decision to reject, for the stated reasons, Ms. Maxfield's treating physicians' assessments.

III.   *Fatigue*

Ms. Maxfield next argues that the ALJ improperly evaluated evidence of her fatigue.  She testified that by the time of her second hearing in December 2004, her fatigue was "just unbelievable at this point." R. 847.  She also reported spending many days confined to her bed.  She asserts now that the ALJ ignored Dr. Greenbaum's findings and Dr. Boyce's testimony that her medication caused sleep deprivation and fatigue and  improperly focused on the effects of the drug Provigil.  Contrary to Ms. Maxfield's assertions, the ALJ considered the evidence of fatigue and did not improperly discuss the effects of Provigil.

The ALJ noted that Ms. Maxfield and her doctors reported that her pain medications made her tired.  He observed that rather than pursuing other forms of treatment, Ms. Maxfield repeatedly requested higher doses of pain medication. R. 38.  He found that on December 9, 2003, Dr. Greenbaum encouraged Ms. Maxfield to spend more time out of bed.  R. 38, 712.  He also found that despite her fatigue, Ms. Maxfield was able to pay attention and perform well during her cognitive evaluations with Dr. Wooden and Dr. Faidley.  R. 43, 197, 606-07.  The ALJ considered how fatigue affected Ms. Maxfield's ability to work and limited her to simple and repetitive work.  R. 43.  He also limited the need for her to interact with others "because of the additional fatigue that these factors could cause." *Id.* The ALJ just did not agree that the medications affected or should affect Ms. Maxfield to the extent that she needed to spend most days in bed.

The ALJ also was entitled to discuss the drug Provigil, which Dr. Greenbaum prescribed to help with Ms. Maxfield's daytime sleepiness. R. 309. Ms. Maxfield reported to Dr. Greenbaum that she preferred not to take Provigil every day because she preferred to rest some days. *Id.* In December 2003, during the same visit in which Dr. Greenbaum encouraged Ms. Maxfield to spend more time out of bed, she told Dr. Greenbaum that she had "mostly stopped taking the medication." R. 712. Because Ms. Maxfield's sleep deprivation and fatigue are logically related to her daytime sleepiness, the ALJ was entitled to discuss Dr. Greenbaum's prescription for Provigil and Ms. Maxfield's decision to stop taking it. The ALJ built an accurate and logical bridge between the evidence of fatigue and his conclusion that Ms. Maxfield was still able to do solitary, simple, and repetitive work. See *Farrell*, 878 F.2d at 989 (recognizing that the "ALJ can weigh evidence and make judgments as to what evidence is most persuasive"). Thus, no remand for this issue is needed.

IV.   *Substantial Evidence*

Finally, Ms. Maxfield asserts generally that the ALJ did not support his ruling with substantial evidence. She claims that he "played doctor" by rejecting evidence from Dr. Greenbaum and Dr. Boyce as well as from Ms. Maxfield herself. She argues that if the ALJ rejected evidence from her treating physicians and discredited her subjective complaints, he should have sought further medical evidence.

In his thirty-one page decision after remand, the ALJ discussed evidence from Ms. Maxfield's treating physicians, from consulting physicians, from Dr. Boyce, and from Ms. Maxfield and her husband. While the ALJ discounted the treating physicians' conclusory opinions that Ms. Maxfield was disabled and Dr. Greenbaum's residual functional capacity assessments, the ALJ credited this evidence and Ms. Maxfield's testimony to find that she suffered from several severe impairments that required extensive physical and mental restrictions on her ability to work. The ALJ concluded that Ms. Maxfield was capable of performing simple and repetitive sedentary work with numerous limitations. He supported his decision with substantial evidence and thus did not need to seek additional medical evidence. See generally 20 C.F.R. § 404.1527(c)(2) ("If any of the evidence in your case record, including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, we will weigh all of the evidence and see whether we can decide whether you are disabled based on the evidence we have.").

*Conclusion*

For the foregoing reasons, the court affirms the ALJ's decision. Final judgment shall be entered consistent with this entry.

So ordered.

Date: February 13, 2008

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

T. Reg Hesselgrave
PALGUTA & HESSELGRAVE
tregh@comcast.net

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov,lin.montigney@usdoj.gov